# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

WEBASTO THERMO & COMFORT
NORTH AMERICA, INC. and
WEBASTO-EDSCHA CABRIO USA, INC.,

      Plaintiffs/Counter-Defendants,     Case No. 16-cv-13456

                                  Paul D. Borman
v.                                  United States District Judge

BESTOP, INC.,                    R. Steven Whalen
                                     United States Magistrate Judge

         Defendant/Counter-Plaintiff.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MICHAEL K. MILANI (ECF NO. 158)

This action involves Plaintiffs Webasto Thermo & Comfort North America, Inc. and Webasto-Edscha Cabrio USA, Inc.'s (collectively "Webasto") claim that Defendant Bestop, Inc. ("BesTop") infringes Webasto's U.S. Patent No. 9,346,342 ("the '342 Patent"), entitled "Vehicle Roof and Roof Opening Mechanism." Webasto claims that BesTop's Accused Product, the Sunrider for Hardtop ("the Sunrider"), infringes Webasto's '342 patent as embodied in Webasto's Black Forest ThrowBack top ("ThrowBack"). BesTop responds that the Sunrider does not infringe and that the claims of the '342 Patent were disclosed in prior art and are therefore unpatentable. The Court has issued claim construction and summary judgment rulings and the

parties have filed *Daubert*[1] and *in limine* motions. Now before the Court is BesTop's

Motion to Exclude the Expert Testimony of Michael K. Milani. (ECF No. 158.) The

matter has been fully briefed and the Court held a hearing on May 23, 2019. For the

reasons that follow, Bestop's motion is DENIED.

## I.      BACKGROUND

The background facts of this litigation are set forth in multiple prior Orders of

this Court and the reader's knowledge of those facts is presumed. Particular facts, as

specifically relevant to the issues in this motion, will be discussed where appropriate.

## II.     LEGAL STANDARD

"Admissibility of expert testimony is governed by Federal Rule of Evidence

702 and informed by the seminal case applying Rule 702, *Daubert v. Merrell Dow

Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *In

re Southeastern Milk Antitrust Litigation*, 739 F.3d 262, 267 (6th Cir. 2014). Fed. R.

Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"[T]he rules of evidence - especially Rule 702 - do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). The trial court's "gatekeeping" task with respect to expert testimony applies not just to scientific evidence, as was at issue in *Daubert*, but to all types of specialized knowledge presented through an expert witness. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999). ""[T]he relevant reliability concern may focus upon personal knowledge or experience . . . [as] there are many different kinds of experts, and many different kinds of expertise." *Id*. at 150. The Court must analyze separately the proposed expert's qualification, reliability and helpfulness.

The Federal Circuit "appl[ies] regional circuit law to evidentiary issues." *VirnetX, Inc. v. Cisco Sys., Inc..*, 767 F.3d 1308, 1324 (Fed. Cir. 2014). "Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit, here the Fifth Circuit." *Micro*

*Chem., Inc. v. Lextron*, 317 F.3d 1387, 1390-91 (Fed Cir. 2003).  The Sixth Circuit

has noted that absolute certainty is not required of an expert but that sheer speculation,

regardless of the qualifications of the speculator, lacks sufficient reliability:

> Rule 702, we recognize, does not require anything approaching absolute
> certainty. *See Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. And where one
> person sees speculation, we acknowledge, another may see knowledge,
> which is why the district court enjoys broad discretion over where to
> draw the line.

*Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 671-72 (6th Cir. 2010).

To determine the testimony's reliability, the court does not "determine whether

[the opinion] is correct, but rather [determines] whether it rests upon a reliable

foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust

Litig*., 527 F.3d 517, 529–30 (6th Cir. 2008).  "As gatekeeper, the trial court only

determines the admissibility of expert evidence; the jury determines its weight. The

court's focus is 'solely on principles and methodology, not on the conclusions that

they generate.'"  *United States v. Stafford*, 721 F.3d 380, 393-94 (6th Cir. 2013)

(quoting *Daubert*, 509 U.S. at 595) (alterations in original).  "[R]ejection of expert

testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530.

## III.   ANALYSIS

Mr. Michael K. Milani was retained by Webasto "to analyze certain accounting,

financial, marketing, and other business data in order to identify the compensation that

would be appropriate for Webasto to receive in the event that liability is found against BesTop." (ECF No. 159-1, Sealed Updated December 7, 2018 Expert Report of Michael K. Milani, p. 2, PgID 3681) ("Milani Updated Report"). Mr. Milani has over 20 years of litigation experience offering opinions relating to economic damages in all types of Intellectual Property matters. (*Id*. 1, PgID 3680.) Mr. Milani has testified in matters pending in Federal Court, State Court, the Patent Trial and Appeals Board ("PTAB") and Alternative Dispute Resolution ("ADR") proceedings. (*Id*.) Mr. Milani also provides management advice related to IP transactions and valuation outside of litigation. (*Id*.) Mr. Milani has served as an adjunct professor and visiting lecturer at numerous universities and holds a Bachelor of Science in Finance from the University of Illinois and a Master's in Business Administration from Northwestern University. (*Id*.) BesTop does not challenge any aspect of Mr. Milani's qualifications to testify as an expert in this case.

For purposes of his work for Webasto on this case, Mr. Milani has assumed that the '342 Patent is valid, enforceable, and infringed. To summarize, he opines that Webasto's damages in this case would be a combination of lost profit and reasonable royalty damages, and his opinion separately analyzes Webasto's damages under both theories. Specifically, Mr. Milani opines that Webasto would be entitled to lost profit damages for the period of time that it was selling its patented Black Forest ThrowBack

("ThrowBack") in competition with BesTop's Accused Product the Sunrider for Hardtop ("Sunrider"). Mr. Milani calculates lost profits based on two different models, depending on how the trier of fact ultimately determines that the relevant market would have evolved *but-for* BesTop's infringement. The range of lost profit damages that Webasto is seeking, taking into account both theories, is $500,009 to $1.7 million. Mr. Milani calculates a reasonable royalty of $63 per unit and the range of reasonable royalty damages for the relevant period is approximately $499,000 to $555,000. The total range of damages to which Webasto will claim it is entitled, including both lost profit and reasonable royalty damages, $1.0 million to $2.3 million. If Webasto is unable to prove lost profits, and the trier of fact were to conclude that Webasto is only entitled to reasonable royalty damages, then Webasto would claim a total of $936,000 in reasonable royalty damages. (Milani Updated Report 4, PgID 3683.)

## A. Mr. Milani's Testimony on Lost Profits

BesTop argues that Mr. Milani's testimony "does not meet the burden for lost profit proof." (Def.'s Mot. 3, PgID 3657.) The parties agree that "[t]o recover lost profits a patentee must show that "but for" infringement it reasonably would have made the additional profits enjoyed by the infringer." *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) (citing *King Instruments Corp.*

6

*v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995)).  The Federal Circuit "has not restricted patentees to any one particular method of proving "but for" causation [and] [a] patentee may resort to any method showing, with reasonable probability, entitlement to lost profits "but for" the infringement."  *Id.*  "Once the patentee establishes the reasonableness of this inference, the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits." *Id.*

The parties also agree that a four-factor test, first set forth by the Sixth Circuit in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc*., 575 F.2d 1152 (6th Cir. 1978), is a well-recognized method for determining whether the "but for" test has been satisfied.  "There is no particular required method to prove but for causation. One 'useful, but non-exclusive' method to establish the patentee's entitlement to lost profits is the *Panduit* test first articulated by the Sixth Circuit."  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017).  Under the *Panduit* four-factor test, a patentee is entitled to lost profit damages if it can establish:

> (1) demand for the patented product;
> (2) absence of acceptable non-infringing alternatives;
> (3) manufacturing and marketing capability to exploit the demand; and
> (4) the amount of profit it would have made.

*Mentor Graphics*, 851 F.3d at 1285 (quoting *Panduit*, 575 F.2d at 1156).

BesTop mounts two specific challenges to Mr. Milani's lost profit calculation, arguing that:  (1) Mr. Milani used the wrong procedure and data when attempting to

calculate the amount of lost profits; and (2) Mr. Milani failed to adequately support his conclusions regarding Webasto's marketing capacity.

### 1. Mr. Milani's utilization of cost data.

BesTop agrees that Mr. Milani correctly tried to calculate lost profit by subtracting total costs from the expected sales price. (Def.'s Mot. 4, PgID 3658.) BesTop argues, however, that Mr. Milani "made a fundamental error when investigating what cost information to consider, and then when actually determining cost." (*Id*.) Specifically, BesTop argues that Mr. Milani improperly used cost information related to the production work done by Webasto Edscha-Cabrio Mexico S.A. de C.V. ("Puebla"), which is a separate legal entity from any of the Plaintiffs in this matter. This challenge relates to the fourth *Panduit* element which requires Mr. Milani to quantify the amount of lost profits. *See generally* Milani Report 30-37, PgID 3709-3716.

BesTop asserts that Puebla, and not the Plaintiffs, actually makes the ThrowBack product that Plaintiffs sell, and argues that Mr. Milani assumed that Puebla was the manufacturing arm of the Plaintiffs and did not know that Puebla was a separate legal entity. BesTop asserts that Webasto actually sends Puebla a purchase order for a set price per unit ($376.50), and Puebla fills the order and sends Webasto an invoice for the price times the number of units. (Def.'s Mot. 5, PgID 3659, Ex. C,

Sept. 27, 2018 Deposition of Jeffrey Russel 72, 84, 106-07, PgID 3893, 3896, 3902.)

Mr. Milani testified that he understood that Puebla manufactured and supplied the ThrowBack product but he did not know if there was a "specific intercompany transfer price" and Mr. Milani did not use the actual price that Webasto pays Puebla in computing cost for his lost profits figure. (Def.'s Mot. Ex. B, 12/12/18 Deposition of Michael K. Milani 22-26, PgID 3828-29.) Mr. Milani calculated his cost figure based on the actual costs incurred by Puebla in manufacturing and producing the ThrowBack, figures that Mr. Milani obtained from Mr. Russel, the Chief Financial Officer for Webasto Thermo & Comfort North America, Inc. (Russel Dep. 6, 31-39, PgID 3877, 3883-85.) BesTop argues that because Mr. Milani did not use Webasto's actual cost, i.e. the invoice price paid by Webasto to Puebla, plus credit card service expenses, warranty expenses, and freight expenses, he understated Webasto's costs and overstated Webasto's profits. Therefore, BesTop argues, Mr. Milani's profit calculation is mistaken and should be excluded.

Webasto responds that the price Mr. Milani actually determined with reference to Puebla's actual production costs and relied on in making his lost profit projections was $379 per unit – in fact higher than the $376.50 per unit invoice cost that BesTop argues Mr. Milani should have used. Webasto also responds that Mr. Milani's calculations expressly considered and included costs for freight, credit card service

expenses, and warranty expenses, as evidenced in his Report. (Milani Updated Report 35, PgID 3714.) Webasto argues that any failure on Mr. Milani's part to understand the legal relationship between Webasto and Puebla, and his utilization of the underlying actual Cost of Goods Sold ("COGS") rather than the invoiced per unit price from Puebla to Webasto, goes to the weight of his testimony rather than its admissibility.

The Court agrees with Webasto. BesTop points to no methodological or functional error in the fact that Mr. Milani relied on the actual underlying costs rather than simply relying on the invoice amount, particularly when the invoice price was less than the price that Mr. Milani arrived at and used in his calculations – which would understate Webasto's profit not overstate it, as BesTop asserts. The fact that Webasto and Puebla established a per unit price (also of course based on those underlying COGS) that was utilized for invoicing does not render Mr. Milani's calculations or methodology unreliable. BesTop states that "Mr. Milani's failure to use the actual price paid to Puebla as the cost of the product to Plaintiffs has the effect of including the profits earned at the Puebla subsidiary in the Plaintiff's economic damage claim," but fails to elaborate on how this is so. (Def.'s Mot. 7, PgID 3661.) And from his Report it appears that Mr. Milani *did* factor in the costs of freight, credit card service expenses, and warranty expenses. Mr. Milani's cost calculation employs

"reliable principles and methods," and relies on "sufficient facts and date." Fed. R. Evid. 702. Each of the criticisms leveled by BesTop goes to the weight of his testimony, not its admissibility, and can be raised on cross-examination. Mr. Milani's lost profit opinions will not be excluded on this basis.

## 2. Mr. Milani's testimony on Webasto's marketing capacity.

BesTop argues that Mr. Milani did not perform a sufficient analysis of Webasto's marketing capacity to prove that Webasto would have made all of the alleged infringing sales that BesTop made. (Def.'s Mot. 7, PgID 3661.) This objection relates to the third *Panduit* factor – demonstrating that the plaintiff had the capability (both manufacturing and marketing) to meet the demand that was in fact satisfied by the infringer's sales.

The Federal Circuit summarized the rules governing a *Daubert* inquiry as follows:

> Under these rules, a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case. *See, e.g., Kumho Tire*, 526 U.S. at 150 [119 S.Ct. 1167] (the gate-keeping inquiry must be tied to the particular facts of the case); *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) (stating that "*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness"). But the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir.2014), overruled en banc in part not relevant here, *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).

Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

*Summit 6, LLC v. Samsung Electronics Co., Ltd*., 802 F.3d 1283, 1295-96 (Fed. Cir. 2015).

As particularly relevant to this aspect of BesTop's challenge to Mr. Milani's opinions, Fed. R. Evid. 703 states:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

In his manufacturing capacity analysis, Mr. Milani relied on a number of sources: (1) conversations with the Mr. Mark Denny (Webasto's Chief Executive Officer) and Mr. Jeff Russel (Webasto's CFO); (2) business planning documents prepared during the project acquisition stage which show estimated sales volumes for the ThrowBack of 7,500 units; (3) discussions with the Mr. Denny who informed Mr. Milani that Webasto anticipated volumes between 7,500 and 10,000 annually and had put in place sufficient capacity to meet that manufacturing need; (4) a March 2016

email to Jeff Russel, CFO, forecasting a monthly production ramp up for the ThrowBack in October, November, and December 2016 of 250, 500, and 1,250 units. Based on these sources, Mr. Milani concluded that Webasto planned for manufacturing capacity greater than BesTop's total actual sales of the Sunrider, and that since Mr. Milani's lost profit calculation only captured a portion of BesTop's Sunrider sales, he concluded that Webasto would have sufficient capacity to manufacture the units claimed in his lost profit analysis. BesTop does not directly challenge Mr. Milani's opinion regarding Webasto's manufacturing capacity.

With respect to marketing capacity, Mr. Milani considered two different scenarios, one in which the market in the "but-for" world would have evolved in a manner consistent with Webasto's initial distribution strategy of exclusively selling directly to customers through its website and one in which the market in the "but-for" world would have evolved in a manner consistent with what actually occurred, i.e. how BesTop actually sold product, following BesTop's infringement, through multi-channel distribution. In connection with the first scenario, Mr. Milani considered a "pre-launch document outlining Webasto's aftermarket strategy which states that after market sales are typically handled through internet sales and drop shipments directly to the customer." (Milani Report 28, PgID 3707.) The pre-launch presentation also details how "marketing of aftermarket products is usually done through

advertisements, trade shows, etc., and the need for a clear marketing strategy to achieve Webasto's estimated sales volumes." (*Id.*)

With respect to "developing a clear market strategy" for direct distribution to customers, Mr. Milani observes that "Webasto performed market research and end customer analysis which included visits to fairs, exhibitions, events and customer clinics," which led Webasto to decide to market to customers "through search engines, review and retail websites and word of mouth from friends, family, experts and new era marketing people." (*Id.*) Based on its marketing research, Webasto "planned to create an extensive online presence through its own web sites, other popular web sites, blogs, picture sites and tweets," and to market at trade shows, exhibitions, brand events and other customer facing events." (*Id.*) Mr. Milani relied on the fact that in support of this strategy, Webasto planned to rely on Puebla for production, Plymouth for Engineering product support and Fenton for warehousing, distribution, tech support and sales/order transactions." (*Id.*) Mr. Milani confirmed that as of the date of his Report, each of those entities was in fact contributing to the ThrowBack as described in the marketing strategy and Webasto had spent at least $491,000 on initial start-up marketing in support of this direct customer strategy. (*Id.*) Based on all of this information, Mr. Milani concluded that "Webasto had the capacity to market the ThrowBack directly to customers, consistent with the assumption underlying" his

direct customer marketing scenario. (Milani Report 28-29, PgID 3707-08; Russel Dep. 31, 44-45, PgID 3883, 3886).

In addition to determining Webasto's marketing *capacity*, Mr. Milani considered several limiting factors when quantifying how many of BesTop's actual sales Webasto would be able to capture with that capacity – Mr. Milani does not conclude that Webasto would have captured 100% of BesTop's sales with this marketing strategy. When considering Webasto's initial strategy of exclusively selling directly to customers only through its website, Mr. Milani considered only those Sunrider sales that BesTop made through resellers who marketed the product directly to U.S. customers. (Milani Report 31, PgID 3710.) He excluded all sales made to customers outside the United States because Webasto did not have the ability to make sales to customers outside the United States through its website. He eliminated any sales that BesTop made through dealers that did not sell the Sunrider directly through the dealer's website. With respect to BesTop's sales to distributors who resold only to dealers and not directly to customers, Mr. Milani calculated the percentage of direct website sales made by dealers and applied that percentage to BesTop's Sunrider sales to distributors. (*Id*.) Thus, contrary to BesTop's suggestion in its motion that Webasto is claiming that it had the marketing capacity to have made *all* of BesTop's sales through the direct customer marketing method, Mr. Milani

actually attempted to account for several factors that resulted in a number of units less than BesTop's total sales.  There is no dispute that Webasto actually abandoned this website-only direct marketing strategy "after several months of competing with the Sunrider" and shifted to BesTop's multi-channel distribution model.  (Milani Report 8m PgID 3687.)

Since shifting strategies to a multi-channel distribution model, "Webasto has not only sold the ThrowBack directly to customers through [its own website], it has also sold the ThrowBack through other retailers such as amazon.com, Auto Image, Bartact, Custom Auto Restyling and Turn 5 Inc." (*Id.*)    In connection with his second lost profits scenario, considering how the market would have evolved in a "but-for" world consistent with what actually occurred, i.e. BesTop making the majority of the sales in the relevant market through (1) direct sales to customers via its website, (2) sales on amazon.com, (3) sales through dealers, and (4) sales through distributors, Mr. Milani first relied on actual numbers for customers that Webasto actually sold to after it shifted its marketing strategy away from strict direct distribution to a mixed distribution strategy, and identified Amazon, ExtremeTerrain.com, Morris 4X4 Center and Unlimited Offroad.  Mr. Milani also relied on discussions with Mark Denny (Webasto's CEO) and Jeff Russel (Webasto's CFO) that gave Mr. Milani "no reason" to doubt that in a "but for" world where the

Sunrider was not available Webasto could not have marketed the ThrowBack to the customers who purchased the Sunrider. (Milani Report 29, PgID 3708.) Mr. Milani also states that it is his "understanding" from discussions with Mr. Denny and Mr. Russel that Webasto has had contact with dealers and distributors who were selling the Sunrider and who were not interested in carrying the ThrowBack given its similarities to the Sunrider. (*Id*.) As an example of this, Mr. Milani cites the testimony of Tyler Ruby, Webasto's Senior Director of Original Equipment and Off Road, who testified at his deposition in this case to an experience with a customer (Quadratec) who was currently selling the Sunrider and would not switch to the ThrowBack unless Webasto drastically reduced its price to compete with BesTop. (Milani Report 30, PgID 3709; Sept. 26, 2018 Deposition of Ruby Tyler 165-69, PgID 4055-56.) In a but-for world where BesTop had no infringing product on the market, Mr. Milani opines, Webasto would have captured this customer.

Where the expert's "methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Summit 6*, 802 F.3d at 1296. "To show 'but-for' causation, the patentee can reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing

product." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003). "In reconstructing the hypothetical but-for market, the Federal Circuit requires 'reliable economic evidence of 'but-for' causation' [*Ericsson*, 352 F.3d at 1377], based on 'sound economic proof of the nature of the market and the likely outcomes with infringement factored out of the economic picture,' *Grain Processing Corp. v. Am. Maize–Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

BesTop challenges Mr. Milani's opinion testimony on marketing capacity on several grounds. First BesTop points out that Webasto concedes that its direct sales distribution strategy was not effective and it shifted to a multi-distribution based on BesTop's superior sales numbers using that strategy. Thus, BesTop attacks Mr. Milani's opinion that Webasto would have captured all of BesTop's sales under that first scenario for this reason alone. As discussed *supra*, Webasto does not claim that it would have made all of BesTop's sales had it continued with direct website marketing only, and Mr. Milani considered several limiting factors in reaching his conclusions as to the number of units that Webasto would actually have been able to capture in a but-for world utilizing only this strategy. This is material appropriate for cross-examination, not a basis for exclusion.

Generally speaking, BesTop is critical of the fact that Mr. Milani's testimony is not based on any underlying economic evidence. First, BesTop argues that

uncritically relying on information obtained from the client, such as Mr. Milani's reliance on Mr. Denny and Mr. Russel's apparent suggestion that under Mr. Milani's second strategy in which Webasto continues to utilize the multi-channel distribution method that it has adopted based on BesTop's model, Webasto would have been able to capture all of BesTop's sales, is not a sound methodology.  It is clear that experts may permissibly rely on assumptions about underlying facts that are stated to them by the client:

> Expert reliance on foundational facts supplied by Google's engineers can be proper so long as they testify to the foundational facts with firsthand knowledge. *See Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04–02123 WHA, 2008 WL 2323856 at *2 (N.D. Cal. May 22, 2008) (Alsup, J.) ("The traditional and correct way to proceed is for a foundational witness to testify first-hand at trial to the foundational fact . . . and to be cross-examined. Then the expert can offer his or her opinion on the assumption that the foundational fact is accepted by the jury."). Google acknowledged in its opposition brief that it will "offer the underlying factual testimony from the percipient witnesses first, before its [damages] experts may testify based on those facts" (Opp.3).

*Oracle Am., Inc. v. Google Inc*., No. 10-cv-03561, 2011 WL 5914033, at *1 (N.D. Cal. Nov. 28, 2011).  The details of the foundational facts that may be supplied by Mr. Denny and Mr. Russel on this limited point are not specified in Mr. Milani's Report. However, if the facts relied upon by Mr. Milani are foundational facts based on Mr. Denny and Mr. Russel's personal experiences in the day-to-day affairs of Webasto, they may be admissible.  *See United States v. Kerley*, 784 F.3d 327, 338-39 (6th Cir.

2014) (finding that in some instances lay opinion testimony based on particularized knowledge gained "through employment in the day-to-day affairs of the business in question" may be admissible under Fed. R. Evid. 701). If proper foundational facts are presented at trial, this aspect of Mr. Milani's testimony may be admissible. If not, these foundational factual assumptions may be excluded from the jury's consideration.

Webasto argues, and BesTop does not appear to disagree, that Webasto and BesTop compete in a "two-supplier" market and that the law allows an inference in such a case that the patent holder would have made all of the infringer's sales. "[U]nder the two-supplier test, a patentee must show: 1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales. In essence, the two-supplier market test collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor." *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003). In a two-supplier market then, both demand and the absence of acceptable non-infringing alternatives are assumed. The two-supplier test, however, does not excuse the plaintiff from establishing the capability of producing and marketing the product: "If the patentee shows two suppliers in the relevant market, capability to make the diverted sales, and its profit margin, that showing erects a presumption of "but for" causation."

*Id*. at 1125.

The Federal Circuit recently examined the quantum of proof necessary to satisfy the third and fourth *Panduit* factors in a two-supplier market in *TEK Global, S.R.L. v. Sealant Systems Int'l Inc.*, 920 F.3d 777 (Fed. Cir. 2019). The Federal Circuit was examining the evidence presented at trial and thus necessarily had a more robust factual record than we have here. But the case is important to consider for the type of proof that was found to support the jury's verdict, including testimony from the plaintiff's CFO, managing director , and "other witnesses" regarding the sales lost to the infringer and the company's ability to market and sell its product, and specifically testimony from plaintiff's expert who relied in part on conversations with plaintiff's CFO:

> As to manufacturing capability, the district court concluded that the jury could reasonably infer manufacturing capacity from TEK's prior activities. *See Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 276–77 (Fed. Cir. 1985) (confirming that past business practices and relationships are probative of the ability to meet demand). We agree. In our view, substantial evidence supports that TEK's losses are not speculative. *State Indus*., 883 F.2d at 1579 (upholding district court's finding of manufacturing capacity in view of head-to-head competition, national recognition, and real sales losses). For example, the inventor of the '110 patent, Mr. Marini, testified that TEK "lost a lot of business" to SSI, J.A. 4431:11–24, and that TEK has "300 people working every day: Engineering, manufacturing, logistics," 4431:20–23. And TEK's damages expert, Dr. Mody, testified that based on the deposition transcripts, reports, financial documents, and *conversations with TEK's CFO*, J.A. 4585:21–4586:5, TEK had the capacity to make the sales that SSI made, J.A. 4591:14–21.

920 F.3d at 790-91. (Emphasis added.) The Federal Circuit agreed with the district court's reasoning that the "jury could reasonably infer manufacturing capacity from TEK's prior activities," and "could reasonably infer marketing capability from TEK's known presence in the market," and could "reasonably rely on [TEK's damages expert's] profits calculations." Importantly, the Federal Circuit focused its review of the evidence as to the third factor primarily on *manufacturing* capacity, almost collapsing the manufacturing and marketing capacity inquiry into one. *Id*. In this case, BesTop does not appear even to challenge Mr. Milani's opinions regarding Webasto's manufacturing capabilities to meet the demand of BesTop's sales numbers.

Mr. Milani relied on much more than pure speculation. He relied on evidence that Webasto had spent nearly a half a million dollars on marketing efforts and had effectively expanded its distribution model to include both amazon.com and several aftermarket dealers and had successfully increased its sales through those expanded marketing efforts despite BesTop's infringing activities. Mr. Milani also informed his opinions through discussions with Webasto's CEO and CFO, which is perfectly acceptable evidence on which an expert may rely if proper foundational facts are established at trial, as the Federal Circuit recently confirmed in *TEK Global*. *See also ART+COM Innovationpool GmbH v. Google*, 155 F. Supp. 3d 489, 510-11 (D. Del. 2016) ("Dr. Goodchild relies on conversations with Google engineer Julien Mercay,

who Google expects call as a witness at trial.  This reliance is permissible. . . Dr. Goodchild's reliance on employee testimony is permissible.") (citing *Oracle*, 2011 WL 5914033, at *1 ("Expert reliance on foundational facts supplied by Google's engineers can be proper so long as they testify to the foundational facts with firsthand knowledge.")).  Mr. Denny, Mr. Russel, and Mr. Ruby will be available to testify at trial and the foundation for whatever facts they relayed to Mr. Milani can be tested there.  *Panduit* requires only reasonable probabilities, not certainties.  BesTop's challenges to Mr. Milani's lost profit opinion goes to the weight and not the admissibility of his testimony.  The Court will not exclude Mr. Milani's lost profit testimony.

### B.    Mr. Milani's Reasonable Royalty Testimony

Following a finding of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  The most common method for determining a reasonable royalty is "the hypothetical negotiation or the "willing licensor-willing licensee" approach, [which] attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citing *Georgia–Pacific*

*Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970)). "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement." *Id.* at 1325. "In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme." *Id.* "The hypothetical negotiation also assumes that the asserted patent claims are valid and infringed." *Id.*

The measure of damages available under the hypothetical negotiation approach is determined utilizing the framework first enunciated in *Georgia-Pacific*, which identifies fifteen (15) factors for possible consideration that may be relevant (dependent on the precise factual setting) to the analysis. Mr. Milani follows the *Georgia-Pacific* framework and analyzes each of the fifteen factors, offering an opinion as to the whether the factor weighs in favor of Webasto, or BesTop, or has a neutral effect on the analysis. BesTop does not challenge Mr. Milani's discussion or opinion as to any specific factor, but rather objects more generally to Mr. Milani's (1) failure to consider possible design arounds, (2) failure to consider the proper time frame for the hypothetical negotiation, (3) failure to use Webasto's actual invoice cost to Puebla rather than actual COGS (this same argument was rejected *supra* and won't be addressed again here), (4) failure to consider realistic price and profit margins based on what actually happened once Webasto shifted to a multi channel distribution

strategy. As a matter of note, BesTop does not offer one case citation as authority for any of the arguments it levels against Mr. Milani's reasonable royalty calculations.

### 1. Failure to consider non-infringing alternatives.

First of all, Webasto makes a very good point that BesTop did not challenge Mr. Milani's opinion on the absence of non-infringing alternatives which Mr. Milani sets forth in his discussion of the second factor of the *Panduit* lost profits analysis. BesTop does not explain why Mr. Milani's identical opinion in that portion of his Report went unchallenged but is challenged here. That being said, the availability of non-infringing alternatives can be relevant to reasonable royalty analysis:

> When an infringer can easily design around a patent and replace its infringing goods with non-infringing goods, the hypothetical royalty rate for the product is typically low. *See Grain Processing*, 185 F.3d at 1347; *see also Riles v. Shell Exploration & Prod.* Co., 298 F.3d 1302, 1312 (Fed. Cir. 2002) ("The economic relationship between the patented method and non-infringing alternative methods, of necessity, would limit the hypothetical negotiation."). There is little incentive in such a situation for the infringer to take a license rather than side-step the patent with a simple change in its technology. By the same reasoning, if avoiding the patent would be difficult, expensive, and time-consuming, the amount the infringer would be willing to pay for a license is likely to be greater.

*AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334-35 (Fed. Cir. 2015).

The essence of BesTop's challenge to Mr. Milani's non-infringing alternative opinion is that Mr. Milani relied on others, specifically Dr. Stein and Mr. Denny, to inform his opinion that there are technically no possible design arounds available to

BesTop because a product that did not possess the specifically positioned tensioning bows and specifically positioned hinge points of the '342 patent would result in a product that was not an alternative because it would "require users to get out of the Jeep to ensure the fabric was properly folded so as to prevent damage to the vehicle, ballooning of the fabric, or lost range of motion when flipping the roof back." (Milani Report 13-15, 25-27, PgID 3692-94, 3704-06.) As discussed at length *supra*, it is entirely permissible for Mr. Milani to rely on Webasto employees (as well as Webasto's own experts) who will be available to testify to trial. And any product that did possess those exact features would, like the Sunrider, be an infringing product, which by definition cannot be considered in the "non-infringing alternative" analysis.

BesTop wants to exclude Mr. Milani's opinion that there are no non-infringing alternatives but does not discuss a single non-infringing alternative in its motion, although it appears that BesTop's expert, Dr. Robinson, has identified evidence of a possible design-around which was presented for the first time in this case only after Mr. Milani had issued his original Report. BesTop just wants to exclude Mr. Milani's opinion because Mr. Milani relied on Dr. Stein and others in reaching his conclusion that there are no design arounds for the patented product. BesTop provides no authority for the statement that Dr. Milani was required to obtain "a reliable written expert opinion from Dr. Stein on the viability of a design-around" before relying on

that conclusion in rendering his opinions. (Def.'s Mot. 15, PgID 3669.) As the Court

established at the hearing on the motion to exclude Mr. Milani's testimony, BesTop's

rebuttal damages expert Mr. Robinson relies on a BesTop employee for his design-

around opinions and Mr. Robinson did not obtain any written opinions when

formulating his design-around opinion. Again, Dr. Stein and Mr. Denny will be

available for cross examination on these topics at trial. BesTop bears the burden of

establishing a non-infringing alternative at trial. *Grain Processing*, 185 F.3d at 1353.

Mr. Milani's opinion that there were no non-infringing alternatives available is

sufficiently supported and is admissible.

### 2. Mr Milani's consideration of Webasto's profit projections.

BesTop objects that Mr. Milani improperly relied on a post-infringement profit

number in reaching his conclusions regarding a reasonable royalty. (Def.'s Mot. 16,

PgID 3670.) BesTop cites no case law in support of this argument and Webasto cites

to *Lucent*, which clearly permits the consideration of such post-infringement evidence:

> [O]ur case law affirms the availability of post-infringement evidence as
> probative in certain circumstances. *In Fromson v. Western Litho Plate
> & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other
> grounds by Knorr–Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana
> Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (en banc), we observed that the
> hypothetical negotiation analysis "permits and often requires a court to
> look to events and facts that occurred thereafter and that could not have
> been known to or predicted by the hypothesized negotiators."
>
> Consideration of evidence of usage after infringement started can, under

appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable. Usage (or similar) data may provide information that the parties would frequently have estimated during the negotiation. *See Sinclair Ref.*, 289 U.S. at 697, 53 S.Ct. 736 ("The use that has been made of the patented device is a legitimate aid to the appraisal of the value of the patent at the time of the breach."). Such data might, depending on the case, come from sales projections based on past sales, consumer surveys, focus group testing, and other sources. Even though parties to a license negotiation will usually not have precise data about future usage, they often have rough estimates as to the expected frequency of use. This quantitative information, assuming it meets admissibility requirements, ought to be given its proper weight, as determined by the circumstances of each case.

*Lucent*, 580 F.3d at 1333-34. There is nothing inherently inappropriate about utilization of a post-infringement profit number and BesTop can challenge this aspect of Mr. Milani's opinion on cross-examination.

### 3. Mr. Milani's reliance on prices that Webasto hoped to command.

BesTop argues that Mr. Milani's conclusions as to the profit that Webasto would have made on the ThrowBack are "unrealistic and unsound." BesTop argues that Webasto would have had to lower its price to sell through dealers, as BesTop does, and that Mr. Milani thus overstated Webasto's potential profitability. But BesTop cites no authority suggesting that Mr. Milani employed an improper methodology or relied upon faulty data. BesTop merely disagrees with his conclusions. This is a purely factual dispute with regard to Mr. Milani's opinions and is properly addressed on cross-examination.

### 4. Mr. Milani's ultimate reasonable royalty figure of $63/unit number.

Rather than actually discussing the data that Mr. Milani relies on in arriving at his $63/unit number, BesTop just states conclusorily that it is "predetermined and unorthodox." BesTop does not cite a single case or criticize any particular aspect of Mr. Milani's calculations, or even discuss any of the calculations that appear in Mr. Milani's discussion of factor 15. BesTop apparently wants the Court to read its conclusion and then figure out how Mr. Milani went wrong. BesTop does not even refer to Mr. Milani's detailed discussion of factor 15 in his Report which relies on extensive financial documentation – rather BesTop cites to pages of Mr. Milani's deposition but does not elaborate on what was said or how it was wrong. In fact the deposition reflects an extensive discussion of how Mr. Milani arrived at this $63 figure in his deposition. (Milani Dep. 103-07, PgID 3848-49.) It is not the Court's obligation to do BesTop's work for them and try to find specific fault with Mr. Milani's opinion that BesTop has failed to sufficiently identify.

Finally, BesTop argues that Mr. Milani used the wrong party to the hypothetical negotiation because the starting date for the hypothetical negotiation was the date the patent issued and at that time a different entity, Webasto-Edscha Cabrio GmbH, a German entity not a party to this lawsuit, owned the '342 patent. But BesTop offers no argument or analysis of how the hypothetical negotiation would have proceeded

differently if the German entity had been doing the negotiating.

## IV.    CONCLUSION

BesTop's motion to exclude Mr. Milani's testimony is DENIED, subject always to valid evidentiary objections raised at trial.

IT IS SO ORDERED.


                                    s/Paul D. Borman
                                    PAUL D. BORMAN
                                    UNITED STATES DISTRICT JUDGE

Dated:  July 25, 2019